## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CHARLES L. HAMILTON,                          Case No. 1:16-cv-706

                    Plaintiff,                Dlott, J.
                                              Bowman, M.J.
        v.


COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.


### REPORT AND RECOMMENDATION

Plaintiff Charles Hamilton filed this Social Security appeal in order to challenge the Defendant's denial of his disability claim.  *See* 42 U.S.C. §405(g).  Proceeding through counsel, Plaintiff presents three claims of error.  For the reasons explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED.

### I.  Summary of Administrative Record

Plaintiff first filed applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") in December 2008,[1] alleging disability beginning October 12, 2008 as a result of a serious motorcycle accident.  Plaintiff was intoxicated and not wearing a helmet at the time of the accident, and sustained very severe injuries, including a traumatic brain injury, multiple fractures, and loss of his left eye.  (Tr. 18, 35).  After Plaintiff's applications were denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  A hearing was held in October 2010 at which Plaintiff appeared, represented by counsel, along with a

_____

[1]Plaintiff was insured for purposes of DIB only through December 31, 2008.

vocational expert ("VE").  On December 21, 2010, ALJ Deborah Smith found that Plaintiff was disabled for a closed period, from October 12, 2008 through December 22, 2009, but that his medical condition improved after that date to the point where he could return to work beginning on December 23, 2009.  (Tr. 149-162).  Specifically, ALJ Smith determined that Plaintiff had improved to the point of being capable of performing a reduced range of sedentary work as long as he could alternate positions.  In addition, she found that Plaintiff

> can occasionally crouch and stoop but could not climb ladders, ropes, or scaffolds.  He has no vision in the left eye; therefore, he cannot perform activities requiring binocular vision for sustained or safe activities.  He should avoid all hazards such as moving machinery and unprotected heights.  He is able to perform simple, repetitive tasks in a work environment with no strict production quotas.

(Tr. 157).

In concluding that Plaintiff had medically improved, the ALJ relied in part on evidence that Plaintiff had reported to his treating physician that he had been cleared to drive by the Drake Center and by his occupational therapist at Mercy Hospital, but that he needed to be cleared by his treating physician (Dr. Kopp) before he could return to his prior work at O'Charley's restaurant.  Dr. Kopp released Plaintiff to return to work on the same date.  (Tr. 157).  Plaintiff returned to work at O'Charley's restaurant in January, 2010, but was moved to the position of dishwasher after he was unable to perform his prior duties as a cook.  Plaintiff was terminated in June 2010, reportedly because he was also unable to adequately perform the dishwasher position.  (Tr. 18). Based upon the testimony of the VE, ALJ Smith determined that although he could not perform his past work, Plaintiff still could perform representative occupations such as clerical, protective services, or tester.  (Tr. 161-162).

2

Plaintiff filed no appeal of that decision. Instead, on April 23, 2012, he filed a new application for SSI benefits, again alleging that he was fully disabled as of the date of his October 12, 2008 motorcycle accident. His second SSI application also was denied initially and upon reconsideration, and Plaintiff again requested a hearing before an ALJ. Represented by new counsel, Plaintiff appeared at a hearing held on August 5, 2014, along with a new vocational expert. At the hearing, counsel confirmed that Plaintiff was amending his application to assert that his disability began on December 22, 2010, the day following the date of the prior adverse decision. (Tr. 36). On August 28, 2014 ALJ Peter Boylan filed an adverse written decision, concluding that Plaintiff remained capable of performing a reduced range of sedentary work despite Plaintiff's showing that he has "more severe impairments than [ALJ Smith] found." (Tr. 13). The Appeals Council denied further review, leaving ALJ Boylan's decision as the final decision of the Commissioner. Plaintiff filed this case in order to seek federal judicial review of the 2014 decision.

Plaintiff was 44 years old on the date he filed his second SSI application, and was 46 (still a "younger individual") at the time of the ALJ's decision. He has a high school education and past relevant work as a cook at the medium level, and as a spray painter at the heavy level. There is no dispute that Plaintiff's limitations preclude all past relevant work.

The ALJ determined that Plaintiff suffers from severe impairments that include "a history of traumatic brain injury, borderline intellectual functioning, affective disorder, attention deficit hyperactivity disorder (ADHD), loss of left eye, diabetes, degenerative changes of the cervical and lumbar spine, status post multiple bilateral rib fractures, fracture of the sternum, multiple lacerations to the spleen, left femoral shaft and neck

3

fractures, left clavicle fracture, right malleolar fracture, right tibial laceration, and complex facial fractures, hepatitis C, and obesity." (Tr. 14).   However, the ALJ determined that Plaintiff did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff was entitled to a presumption of disability.  (Tr. 15).   Instead, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform a limited range of sedentary work with the following restrictions:

> [T]he claimant must be allowed to stand briefly for a few minutes every hour and during regular breaks; he can never climb ladders, ropes, and scaffolds; he is limited to occasional balancing, stooping, kneeling, crouching, and crawling; he has limited depth perception and limited field of vision as he has no vision in the left eye; he is able to avoid ordinary hazards in the workplace such as boxes on the floor and doors being ajar and approaching people and vehicles; he must avoid all exposure to workplace hazards; he must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; he is limited to simple, routine, and repetitive tasks; he is not able to perform at a production rate pace such as generally associated with jobs like assembly line worker, but he can perform goal oriented work such as generally associated with jobs like office cleaner; the claimant is limited to simple work related decisions; he is limited to occasional and superficial interactions with supervisors, co-workers, and the public; and he is limited to tolerating occasional changes in a routine work setting.

 (Tr. 17).  Based on the testimony of the VE, the ALJ determined that Plaintiff still could perform a substantial number of jobs in the national economy, including the representative unskilled occupations of coupon/counter scanner, general laborer, and hand packer.  (Tr. 23).   Therefore, the ALJ concluded that Plaintiff was not under a disability.  (Tr. 23-24).

In his Statement of Errors, Plaintiff argues that the ALJ erred when he: (1) failed to adequately evaluate treating physician evidence; (2) negatively assessed Plaintiff's credibility; and (3) failed to include additional RFC limitations.  None of the asserted errors requires reversal.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

Whether considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential

benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

**B. Plaintiff's Assertions of Error**

**1. Evaluation of Treating Physician Evidence**

Plaintiff first complains that the ALJ "scarcely mentioned or referred to records provided by the claimant's treating physicians." (Doc. 8 at 4). Plaintiff references Dr. John Beresh,[2] his pain management specialist, who treated Plaintiff only from May 2011 through June 2012. In the course of assessing Plaintiff's credibility, the ALJ noted that Plaintiff

---

[2]The ALJ's decision misspells this physician's surname as "Beresch."

> stopped going to pain management in June [2012] because his pain management physician, John Beresch, M.D., confronted the claimant about his use of illegal drugs and alcohol. The claimant was taking benzodiazepines and amphetamines along with his prescription opioids and was smoking marijuana and using alcohol to excess…. Dr. Beresch told the claimant that he could no longer prescribe …opioid pain relievers and the claimant opted voluntarily to end the treatment relationship.

(Tr. 19, citing Tr. 535). Plaintiff does not dispute the accuracy of this account, but asserts that "[t]his happened during a time when [Plaintiff's] relationship with his girlfriend ended and his depression worsened." (Doc. 8 at 4).

The substance of Plaintiff's argument is not entirely clear to this Court. To the extent that he believes that the argument mitigates in favor of a stronger credibility finding than found by the ALJ, it does not overcome the substantial evidence that exists in favor of the ALJ's adverse credibility finding, discussed below in the context of Plaintiff's second claim of error. To the extent that Plaintiff believes that the ALJ should have devoted more discussion to Dr. Benesh's records, Plaintiff's argument is also unclear. Dr. Benesh did not offer any medical opinions that would suggest that Plaintiff's pain was disabling. Treatment records differ from medical opinions, and therefore are not evaluated in the same way. *See generally, Brownawell v. Com'r*, 554 F.3d 352, 356 (3rd Cir. 2008). Dr. Benesh's clinical notes consistently reflect that Plaintiff reported that his pain medications gave him 90 to 100% relief from his pain, with no side effects. (Tr. 21, citing Tr. 485-89, 491, 494). Although those medications were stopped due to Plaintiff's drug and alcohol abuse, the ALJ properly noted that Plaintiff continued to see his primary care provider "and would presumably be able to receive a non-opioid pain reliever if requested," but did not seek additional pain relief. (Tr. 21). In fact, the undersigned's review of Plaintiff's treatment records reflect that Plaintiff did not report any significant pain to physicians he visited after June 2012.

7

Additionally, while Dr. Benesh noted Plaintiff had limited range of motion in his ankle and tenderness in his back, he also noted that Plaintiff had normal extension in his spine, no tenderness, negative straight leg raising, no instability in his knee, a normal gait, and normal curvature in his back.  (Tr. 489-490, 495, 500, 503).

As the ALJ pointed out, Plaintiff did not have any physical or occupational therapy during his alleged disability period.  (Tr. 19).  Plaintiff also did not follow a diabetes friendly diet, and did not have any significant symptoms related to his hepatitis C.  (Tr. 19).  Thus, routine treatment records reflect no additional impairments from those diagnoses.

Plaintiff complains that the ALJ failed to "mention" the "findings" of other treating sources, including Dr. Mary Lee, Dr. Bernard DeSilva, Dr. Stephen Zitelli, and failed to reference records from Health Source of Ohio and from the Neighborhood Health Care. (Doc. 8 at 5).  Importantly, Plaintiff cites to no specific records or "findings" by any of the physicians that he believes that the ALJ failed to adequately consider.  Plaintiff's argument is so cursory as to be arguably waived.  Nevertheless, the undersigned has examined the entirety of the referenced records and finds no error.

Again, treatment records are not the equivalent of medical opinions. An ALJ need not address every clinical note or piece of evidence.  *See Miller v. Colvin*, 2015 WL 3970298 (S.D. Ohio June 30, 2015).  By contrast, when it comes to medical opinions, which an ALJ is required to discuss, an ALJ generally must give controlling weight to well-supported opinions by treating physicians if those opinions are not contrary to other substantial evidence.  *See* 20 C.F.R. §404.1527(c)(2).  Here, none of the referenced physicians ever completed RFC evaluations or otherwise offered any relevant medical opinions concerning Plaintiff's work-related limitations.

8

There is no legal requirement for an ALJ to reference every physician's name with whom a plaintiff has ever treated. On the record presented, the undersigned can discern no error in the ALJ's failure to reference the identified treating physicians by name. For the sake of completeness, the undersigned has carefully reviewed all of the referenced records. Some, like records from the Neighborhood Health Care clinic, predate Plaintiff's alleged onset of disability in this case and relate instead to the earlier period during which Plaintiff was adjudicated not to be disabled. None of the other records support Plaintiff's claim, and all were referenced at least briefly by the ALJ in this case.

For example, treating physician Dr. Mary Lim-Lee prescribed an inhaler to Plaintiff for episodes of bronchospasm, and treated his diabetes and hypertension in March and May 2014. She noted on physical exam that Plaintiff had a normal range of motion, no edema, and normal mood and affect. (Tr. 638, 642). Although Dr. Lim-Lee was not mentioned by name, her records were referenced by the ALJ. (Tr. 19, citing Exhibit B12F).

The index of the Administrative Record lists progress notes, dated 7/11/2012 to 7/24/2012 from Dr. Bernard DeSilva at Tr. 1452-1359. (Exhibit B20F). However, close examination reveals that those pages contain additional clinical records of Social Worker Karen Worher, whose records were also discussed by the ALJ. (Tr. 20, citing Exhibit B17F; *see also* Tr. 22). Like the primary care records of Dr. Lim-Lee, the records add nothing to Plaintiff's claim.

Dr. Stephen Zitelli, a physician with Bethesda Family Practice, saw Plaintiff in December 2012. Additional records from other physicians in the same practice group are included with his records. (Tr. 618-635). The records reflect exams in December

9

2012 and August 2013 that reflect no myalgias or arthralgias on musculoskeletal exam, and many other normal and "negative" findings.  (Tr. 621, 627).  At the August 2013 visit, the only pain that Plaintiff reported was foot pain relating to his July 2013 bicycle accident, which apparently was transitory.  While the ALJ did not mention Dr. Zitelli by name, his records were referenced.  (Tr. 19, citing Exhibit B11F).

Finally, the records from the Health Source of Ohio and Neighborhood Health Clinic were both referenced by the ALJ (Tr. 19), and fail to support Plaintiff's claim. Many of the records are duplicative of the June 25, 2012 documentation of Plaintiff's discharge from pain management due to alcohol and drug abuse.  (Tr. 594, 599, 603).

### 2. The ALJ's Credibility Determination

In his second assignment of error, Plaintiff argues that the ALJ failed to comply with SSR 96-7p when evaluating his credibility.  SSR 96-7p explains that an ALJ must not draw any inferences about a failure to seek or pursue regular medical treatment without first considering any explanations that an individual may provide, or other information in the record, that might explain infrequent or irregular treatment.  SSR 96.7p, 1996 WL 374186 (July 2, 1996).   I find no error in the ALJ's analysis in this case.

An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Further, a credibility determination cannot be disturbed "absent a compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions

among the medical records, his testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

Observing Plaintiff's demeanor and evaluating his testimony in this case, the ALJ specifically found that Plaintiff's subjective complaints about the intensity, persistence and limiting effects of his symptoms to be "not entirely credible." (Tr. 20). Plaintiff testified that he sleeps 16 to 22 hours a day and does nothing else. (Tr. 55). However, the ALJ does not appear to have accepted that uncorroborated testimony, which was undermined by other evidence in the record. For example, Plaintiff reported to the agency that he took care of his dog, cleaned the house, shopped, went outside on a daily basis and sometimes spent time playing cards with his friends. (Tr. 317-320). The ALJ also cited other evidence of Plaintiff's activities of daily living. Records reflected that Plaintiff was injured in a bicycle accident in July 2013, when a car hit him while he was not wearing a helmet. (Tr. 19). Plaintiff sustained fractures to his face in that accident, but was cleared for a normal diet in October 2013 and did not seek further treatment other than the referenced August 2013 single visit to his primary care doctor. Prior to that accident, Plaintiff performed various activities, including riding his bike, home painting, and maintenance work, which the ALJ found to be inconsistent with Plaintiff's more extreme statements of his limited activities on his disability reports. (Tr. 20). Plaintiff reported to Dr. Benesch in November 2011 that he was able to hunt and make "deer jerky." (Tr. 502). The ALJ noted that Plaintiff lived on his own and shopped for basic needs. (Tr. 15).

At the hearing, Plaintiff testified that the loss of his left eye precludes him from working. (Tr. 52). However, Plaintiff remained capable of driving and riding a bicycle, and the RFC accounted for his vision issue. (Tr. 21).

The ALJ also cited Plaintiff's report that his pain medications provided him with nearly complete relief, with no significant side effects.  Despite claiming a disabling level of pain, Plaintiff chose not to continue treating with Dr. Benesch after Dr. Benesch informed him he would no longer prescribe opioids.  The ALJ noted that Plaintiff never sought additional medications after being discharged from treatment by Dr. Benesch as among the additional factors for an adverse credibility determination.  (Tr. 21).

In addition, the ALJ pointed out that Plaintiff underwent two physical consultative examinations (in August 2011 and in January 2013) that failed to support Plaintiff's subjective complaints.  Instead, the consulting physicians estimated that Plaintiff was capable of performing mild to moderate amounts of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects. (Tr. 18-19).

In addition to those physical consulting exams, Plaintiff underwent three psychological consultative examinations (2009, 2011, and 2012) that failed to fully support Plaintiff's subjective complaints. (Tr. 19-20).  After the last psychological exam in July 2012, Plaintiff received limited mental health treatment from a social worker.  However, Plaintiff failed to show up for appointments after attending only two therapy sessions.  (Tr. 20).  During his initial evaluation, Plaintiff reported a history of alcohol abuse and anger issues, indicating he had been arrested for driving under the influence six times, and that his girlfriend had broken up with him and gotten a restraining order against him. (Tr. 20).  None of Plaintiff's psychological exams found that Plaintiff's focus deficits or other deficits would prevent him from working.  Instead, his GAF scores indicated symptomatology within the moderate to mild range.  (Tr. 21).

The ALJ gave "some consideration" to the testimony of Plaintiff's friend, lay witness and former co-worker.  Mr. Krego[3] primarily testified to the cognitive and physical limitations that he observed after the accident, and how those limitations caused Plaintiff to lose his job at O'Charley's.  However, there is no dispute that Plaintiff remains incapable of performing his prior job.  The ALJ stated that the mental and physical RFC limitations as determined would fully account for the limitations that Mr. Krego reported having observed.  (*Id.*)

Plaintiff complains that the ALJ improperly drew an adverse inference about his failure to seek additional treatment without sufficiently considering Plaintiff's limited financial resources.  After he broke up with a girlfriend, he lived in a tent in his friend's backyard until members of his church donated a camper to him.  At the time of his last hearing, he lived in the camper in the church's parking lot.  However, in July 2013 after his bicycle accident, a hospital social worker offered to place him in a different environment and he declined.  (Tr. 1211).  There is also evidence that despite his allegedly dire financial circumstances, he continued to smoke between one half and one pack of cigarettes per day.  (Tr. 612, 618, 620, 626, 1196, 1437, 1444, 1448).  Although Plaintiff testified that he smoked hand-rolled cigarettes because he could not afford regular cigarettes (Tr. 43), he also reported to various professionals that he occasionally drank alcohol.  (Tr. 536, 606, 620, 626, 1196).  He reported in June 2012, just after filing for disability, that he "got shitfaced at a bar."  (Tr. 535).

The ALJ specifically recognized that Plaintiff "has limited financial resources that affect his ability to seek treatment," but found that those limited resources did not *fully* explain Plaintiff's failure to report pain or to seek any additional treatment for pain, such

---

[3]The ALJ misspells his name as Mr. "Crago."  (Compare Tr. 18 with Tr. 57).

13

as emergency room visits or requests for additional treatment when he did see a physician (such as periodic visits to his PCP from 2012- 2014). (Tr. 21). Plaintiff argues that the ALJ should not have assumed that he "should have gone to the emergency room with no intention of paying," and instead should have given greater consideration to Plaintiff's testimony that he currently "sleeps all day and isolates himself from others as a way of coping with his mental limitations." (Doc. 8 at 7). While counsel offers alternative explanations for Plaintiff's behavior, it is worth noting that Plaintiff himself did not offer testimony concerning why he chose not to seek ER or other treatment. Plaintiff's testimony regarding the number of hours he sleeps each day was not corroborated by other record evidence, and the ALJ was not required to accept that testimony or counsel's newly offered explanations for Plaintiff's alleged sleep patterns. Counsel's arguments also fail to overcome the reasonable adverse inferences drawn by the ALJ, especially in light of the many factors and substantial evidence identified by the ALJ to support his adverse finding.

### 3. Substantial Evidence Supports the RFC Determined by the ALJ

Plaintiff's third claim is that the ALJ should have included additional, work-preclusive limitations in his RFC. Plaintiff argues that his mental limitations are more severe than those found by the ALJ. He testified that he cannot focus on more than one thing at a time, and is easily distracted. (Tr. 16). He argues that his problems with memory, concentration persistence and pace, social functioning, ability to deal with workplace stress and ability to work at a production rate pace are so severe that they precluded all work. He relies primarily on a citation to a single page of a psychological consulting report, which described mainly "mild" symptoms relating to depression. (*See generally* Tr. 476-483).

14

Plaintiff notes that during the course of questioning the VE, the ALJ asked whether there would be work available to a person who would be off task 20% of the work day and who would miss two days of work per month.  The VE responded that no work would be available for a person with either of those limitations.  (Tr. 134).

Plaintiff now argues that the ALJ should have found that he has those work-preclusive limitations. However, the ALJ's decision not to include additional restrictions that Plaintiff would be off-task 20% of the day and miss two days of work per week is supported by substantial evidence.  The ALJ was not required to include additional restrictions merely because he presented the restrictions among several hypotheticals posed to the VE.  (Tr. 62-64).  An ALJ is tasked with determining a plaintiff's RFC, and is required to incorporate limitations in a hypothetical to a vocational expert only insofar as the ALJ determines those limitations are supported by the record.  *See Maziarz v. Sec'y of HHS*, 837 F.2d 240, 247 (6th Cir. 1987)(where ALJ rejected restrictions, he was not required to rely on the VE's response to hypothetical question that assumed those restrictions).   Here, the ALJ determined that the following mental RFC accommodated all limitations supported by the record:

> [Plaintiff is] limited to simple, routine, and repetitive tasks; he is not able to perform at a production rate pace such as generally associated with jobs like assembly line worker, but he can perform goal oriented work such as generally associated with jobs like office cleaner; the claimant is limited to simple work related decisions; he is limited to occasional and superficial interactions with supervisors, co-workers, and the public; and he is limited to tolerating occasional changes in a routine work setting.

(Tr. 17).

Plaintiff advocates for the additional limitations based upon his own subjective testimony (Tr. 47), and other evidence.  However, the ALJ reasonably discredited

Plaintiff's more extreme complaints, and no other evidence required the ALJ to include the additional restrictions that Plaintiff now advocates.

For example, Plaintiff's friend and former co-worker testified to his cognitive limitations, (Tr. 58), but there is no dispute that Plaintiff cannot return to his former restaurant work. Plaintiff points to the March 24, 2009 consulting exam of Dr. Siefert, but it is noteworthy that the date of that exam occurred prior to Plaintiff's alleged onset of disability, at a time when there is no dispute (due to the 12/21/2010 decision) that Plaintiff was not disabled. In any event, Dr. Siefert's opinions that Plaintiff had difficulty concentrating and focusing and could not work at a "rapid pace" for eight hours are fully accommodated by the RFC determined in this case. (*See* Tr. 425).

Plaintiff cites Dr. Jessica Twehues's 2011 opinion that Plaintiff "may" have difficulty understanding and retaining instructions for "multi-step complex tasks" due to difficulties in concentration and attention. (Tr. 479, 481). The ALJ's limitation to "simple, routine, and repetitive" tasks accounts for this limitation. Dr. Twehues also opined that Plaintiff would be easily distracted and likely to be slowed by mild depressive symptoms, with difficulty relating to supervisors and coworkers. (*Id.*) She opined he is easily overwhelmed by stress, and would likely have difficulty adjusting to major changes, but could respond appropriately to everyday minor workplace pressures. (Tr. 481-482). Again, these opinions appear to be fully accommodated by the limitations to "occasional and superficial" interactions with supervisors and coworkers, with only "occasional" changes in a "routine" work setting.

Plaintiff relies on Dr. Twehaus's statements that Plaintiff "may" and/or would be "likely" to have functional difficulties, (Tr. 481), but she prefaced her statements by noting her reliance on Plaintiff's subjective reports. During testing, she noted that he

accurately followed all simple instructions, despite his report of significant difficulties, and opined that he "may" have trouble with "multi-step complex tasks" (Tr. 481). Similarly, she noted that he "tracked conversation relevantly and did not appear easily distracted" during testing, but that according to his subjective reports, he "may" have difficulty sustaining attention for prolonged periods of time and become easily distracted and work at a slower pace. (*Id.*) Dr. Twehues did not opine that Plaintiff would be off-task 20% of the time, or that he would miss two days of work per month.

The last evidence on which Plaintiff relies is Dr. Johnson's 2012 consulting report, in which she noted a slowed rate of speech, with below average performance on memory/recall tasks. (Tr. 608-609). Dr. Johnson opined that Plaintiff "may" show work pace slower than that of his peers. (*Id.*) Although Dr. Johnson also noted that Plaintiff was "likely to show a pattern of periods of time away from work due to mental health issues," (Tr. 609), her report does not specify the number of days per month, and the ALJ was not required to adopt that portion of her opinion. He explained that he gave the opinions of both Drs. Johnson and Twehaus "some" weight, and fully explained why he believed Plaintiff could still perform simple, routine, repetitive tasks that did not require a production rate pace, more than occasional changes, and more than occasional and superficial interactions with others. (Tr. 17). The ALJ acknowledged Plaintiff's testimony concerning more severe limitations, but noted that during consulting exams, Plaintiff was able to perform most tasks, albeit at a slower pace. (Tr. 16, citing 476-83, 604-610).

Considering both the medical evidence and the ALJ's credibility assessment of Plaintiff's subjective complaints, the undersigned finds the mental RFC determined by the ALJ to be supported by substantial evidence. None of the medical opinion

17

evidence, or co-worker's testimony, validates Plaintiff's assertion that he would miss two days of work per week or be off-task 20% of the time.  Therefore, the ALJ was not required to incorporate those additional limitations into Plaintiff's RFC.  Because the ALJ's non-disability decision relied on a hypothetical question that included all relevant limitations that were supported by the record, the VE's testimony provides substantial evidence to support his decision.  *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001).

   **III.  Conclusion and Recommendation**

   For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**


                                         */s Stephanie K. Bowman*
                                         Stephanie K. Bowman
                                         United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CHARLES L. HAMILTON,                              Case No. 1:16-cv-706

                                                 Plaintiff,
                                                 Dlott, J.

                                                 Bowman, M.J.
        v.


COMMISSIONER OF SOCIAL SECURITY,

                                                      Defendant.


**NOTICE**

        Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written

objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS**

of the filing date of this R&R. That period may be extended further by the Court on

timely motion by either side for an extension of time. All objections shall specify the

portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law

in support of the objections. A party shall respond to an opponent's objections within

**FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to

make objections in accordance with this procedure may forfeit rights on appeal. *See*

*Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.

1981).